**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| FELICIA BEY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) C.A. No. 2023-0233-SEM |
| | ) |
| KAREN RENEE LEAKE, individually, | ) |
| and as Executrix pf the Estate of | ) |
| Joseph Holder Bey, deceased, | ) |
| | ) |
| Respondent. | ) |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dated: October 8, 2024

1.      This final report makes post-trial findings of fact and reaches conclusions of law regarding Felicia Bey's (the "Petitioner") challenge to the purported last will and testament of the late Joseph Holder Bey (the "Decedent"). The respondent is Karen Renee Leake (the "Respondent," and together with the Petitioner, the "Parties").

2.      The Petitioner initiated this action on February 23, 2023, through a petition for review of proof of the Decedent's purported last will and testament dated February 14, 2018 (the "Purported Will").[1] After a slow start, the Respondent answered the petition on April 26, 2023.[2] On July 10, 2023, I granted the Parties'

---

[1] Docket Item ("D.I.") 1.

[2] D.I. 16.

proposed schedule, setting trial for May 16, 2024.[3] This action proceeded apace, with two minor bumps in the road: (1) due to a scheduling conflict, trial was rescheduled to May 14, 2024;[4] and (2) the parties presented, and I resolved, various evidentiary objections pre-trial.[5] In pertinent part, I precluded the testimony of one of the Respondent's proposed witnesses and overruled the Respondent's challenge to the Petitioner's expert witness's report.[6] I deferred additional rulings until trial.

3. Trial proceeded as scheduled on May 14, 2024.[7] Thereat, I ruled on additional evidentiary objections; in pertinent part, I decreed that the deposition of witness Fred Strange would be admitted through designations and counter designations unless the Parties agreed otherwise.[8] Through a May 21, 2024 stipulation and proposed order, the Parties agreed to admit Mr. Strange's deposition

---

[3] D.I. 20.

[4] D.I. 22.

[5] *See* D.I. 38.

[6] *Id.*

[7] To her attorney's surprise, the Respondent did not appear at trial. *See* D.I. 43 ("Tr.") at 3:9–10. Counsel moved for a continuance, but I denied that motion and trial proceeded in the Respondent's absence. *Id.* at 3:22–4:1. Counsel also asked for the opportunity to brief a basis on which to admit designations from the Respondent's deposition into evidence, but ultimately did not submit any such request. *See id.* at 123:5–124:12.

[8] *Id.* at 13:5–14:20.

in full.[9] I granted that stipulation on May 23, 2024, at which time I took this matter under advisement.[10]

4. This is my final post-trial ruling.[11]

**FINDINGS OF FACT**[12]

5. The Parties' stipulations, evidence presented at trial, and that of which I take judicial notice, support the following findings of fact.

6. The Decedent died on August 4, 2022, at the age of 68.[13] The Decedent's passing was sudden and unexpected.[14] He "went into cardiac arrest at home and the ambulance took him to Temple [Hospital,]" where he passed nearly two weeks later.[15]

---

[9] D.I. 41. Citations to Mr. Strange's deposition are in the form of "Strange Dep. __."

[10] D.I. 42.

[11] While this matter was under advisement, the Petitioner grew impatient and contacted my chambers inquiring about the status of my ruling. *See* D.I. 44. I expressed my displeasure by letter and received an apologetic letter in response. D.I. 45. Apology accepted. But to be clear, the contact was not "actually a voicemail message[;]" I have the pleasure of sitting mere feet from my assistant and overhearing many of her conversations with counsel and litigants. I grow most protective when I hear someone giving her a hard time. I trust my message was received and I will not overhear similar conversations in the future.

[12] Citations to the trial transcript are in the form of "Tr." When unclear who was speaking, citations to the transcript include a parenthetical indication of the speaker's first initial and last name. Defined parties are identified with that designation. I grant the evidence the weight and credibility I find it deserves. The Parties' joint exhibits are cited as "JX __."

[13] D.I. 36 ("Pretrial Order") at p. 5 ¶¶ 1–2. The Petitioner described her father as an outgoing, social man, who was family- and neighborhood-oriented. Tr. 20:19–23.

[14] *Id*. at 36:19–21 (Petitioner).

[15] *Id*. at 37:12–21 (Petitioner).

7.     The Decedent left behind four children: the Petitioner; Jacquetta Bey; Joseph Bey, Jr.; and Kacim Bey.[16] The Petitioner enjoyed a close relationship with her father, spending holidays together and discussing both family and business matters.[17]

8.     The Decedent also left behind his longtime significant other, the Respondent.[18] The Decedent and the Respondent, although not married, had lived together since approximately 1988.[19]

9.     At the time of his death, the Decedent was the sole owner of the property located at 63 Foxwood Drive in Smyrna, Delaware, and thirteen (13) properties in Philadelphia, Pennsylvania.[20]

10.     The Purported Will lists the Respondent as executrix and sole beneficiary of the Decedent's estate.[21] The Purported Will was witnessed by Mr. Strange and Diedra Jones, and notarized by Barbara Chappelle.[22] Mr. Strange testified at his deposition that he was walking around in downtown Philadelphia with

---

[16] *Id.* at 16:20–17:4 (Petitioner).

[17] *See id.* at 22:14–23:11 (Petitioner).

[18] The Parties disagree whether the Decedent and the Respondent were engaged or not. *Cf. id.* at 32:2–24 (Petitioner).

[19] Pretrial Order at p. 5 ¶¶ 4–5.

[20] *Id.* ¶¶ 6–7.

[21] *Id.* ¶ 8; JXA (Purported Will).

[22] JXA. Ms. Chappelle could not be located by the Parties, and is upon information and belief, deceased. Pretrial Order at p. 6 ¶ 13.

the Decedent and Ms. Jones on the day of execution, when the Decedent told them that "he wanted [them] to sign something, it was only going to take a few minutes."[23] Mr. Strange recalls going to what looked like a "notary place" where they all showed their identification, signed the Purported Will, which was in a yellow envelope the Decedent had, "and that was a wrap."[24] When showed a copy of the Purported Will at his deposition, Mr. Strange did not recognize the document, explained he "didn't really look at it," but confirmed he signed his name on the final page.[25]

11.     The Petitioner believes that her father's signature of the Purported Will was forged.[26] Her belief was bolstered by expert testimony from Khody Detwiler. Mr. Detwiler is a named partner of, and forensic document examiner with, Lesnevich & Detwiler.[27] In that role, Mr. Detwiler works to address "issues or questions involving the authenticity of documents, which would also, by extension, include handwriting and signatures."[28] Mr. Detwiler used the Scientific Working Group for

---

[23] Strange Dep. 46:11–47:4, 48:16–20.

[24] *Id*. at 49:12–15, 50:6–9, 66:21–23.

[25] *Id*. at 50:15–51:20, 58:1–6. At his deposition, Mr. Strange indicated he was seeking compensation for his testimony. *Id*. at 64:12–16.

[26] Tr. 54:3–5. The Petitioner also doubts the veracity of the witness signatures from Mr. Strange and Ms. Jones. *See id.* at 55:12–16.

[27] *Id*. at 64:20–65:7.

[28] *Id*. at 65:6–10. Mr. Detwiler holds a bachelor's degree in criminal justice and first became involved in his current field when he "completed a semester-long internship with Gus Lesnevich, who is the Lesnevich of Lesnevich & Detwiler[.]" *Id*. at 66:7–12. Mr.

Forensic Document Examination standards[29] to review the Purported Will and concluded that the Decedent "did not write either of the questioned . . . signatures" on the Purported Will.[30] Mr. Detwiler found at least seven "significant differences . . . between the questioned and known signatures[,]" and found the known signature from the same day the Purported Will was executed particularly compelling.[31] Mr. Detwiler also found "significant differences in the execution characteristics between [the] questioned and known" signatures, finding the signatures on the Purported Will showed signs of hesitation, patching, and tracing, none of which were present in the known signatures of the Decedent.[32] On his nine-point conclusion scale, Mr. Detwiler made the "strongest conclusion that you can render in a handwriting comparison[,]" eliminating the signatures on the Purported Will as definitively not written by the Decedent.[33]

---

Detwiler's accomplishments and experience are impressive and too numerous to restate, with the appropriate acclaim and fanfare, in this limited ruling. *See* JXB, p. 2, Exs. 1–2.

[29] Tr. 67:4–18.

[30] *Id*. at 8:22–86:2. Mr. Detwiler explained in detail his investigatory review process. *Id*. at 77:8–80:18. For this review, Mr. Detwiler had 77 known signatures of the Decedent for comparison purposes. *Id*. at 84:11–17; *see also* JXB (expert report); JXH (demonstratives pulled from JXB).

[31] Tr. 87:18–21, 84:20–85:2; *see also id.* at 87:22–90:19 (explaining the seven identified differences).

[32] *Id*. at 92:5–93:7.

[33] *Id.* at Tr. 95:23–97:19; JXB. Mr. Detwiler estimated he billed somewhere around $9,000.00 for his analysis, plus $1,400.00 to appear at trial. Tr. 101:14–20. Mr. Detwiler admitted that he used photocopies, rather than wet signatures, in his analysis, but believed

12. The designations in the Purported Will also contradicted the Petitioner's understanding of the Decedent's wishes; she testified as to her belief that her father wanted "[t]o split everything equally amongst his children."[34] Further, the Petitioner testified that she and the Respondent discussed estate planning while the Decedent was in the hospital, during his final illness, and the Respondent "denied that [there] was a will."[35]

13. Shortly after the Decedent's death, the Parties were already at odds. Per Mr. Strange, the Parties argued about the estate at the Decedent's funeral, which escalated into "[h]ollering[.]"[36] And not long thereafter, the Respondent began efforts to open and probate the Decedent's estate. She initially worked with Steven Schwartz, Esquire at Schwartz & Schwartz, P.A. in Dover, Delaware.[37] Through a letter dated August 29, 2022, Mr. Schwartz invited the Petitioner to sign a renunciation form, to permit the Respondent to petition to administer the estate.[38]

---

"there was a high level of clarity in the images that were provided for [his] examination." *Id*. at 103:17–23.

[34] *Id.* at 25:20–22. But, per Mr. Strange, the Decedent did not want to leave his kids anything "because they don't know how to take care of it and they'll piss it away." Strange Dep. 42:12–15; *but see id.* at 65:17–20 (explaining that he was "sure" the Decedent would want to also take care of his children but he "can't really speak on that").

[35] Tr. 39:3–5.

[36] Strange Dep. 35:10–16.

[37] *See* JXC, Ex. A.

[38] *Id.*

The Petitioner did not accept that invitation.[39] Rather, she contacted her attorney and Mr. Schwartz to make her position known—she was not going to renounce her interests in favor of the Respondent.[40]

14.     On October 17, 2022, Mr. Schwartz wrote to the Petitioner again, this time including her siblings.[41] Mr. Schwartz explained that the Respondent "was able to open an estate . . . because she found a [w]ill which left her everything and which also named her [e]xecutor."[42] With this find, and change of circumstances, Mr. Schwartz bowed out, referencing an impermissible conflict of interest and informed the Decedent's children that they had until April 6, 2023 to contest the will.[43] Mr. Schwartz's letter was a surprise to the Petitioner, who had not previously heard that a will had been "found."[44]

---

[39] Tr. 43:11–17 (Petitioner) ("I wasn't giving up my rights to her.").

[40] *Id*. at 44:6–14 (Petitioner).

[41] JXC, Ex. B.

[42] *Id.*

[43] *Id.* Mr. Schwartz's letter reads as if the family had hired him jointly, but the Petitioner denied that she ever asked Mr. Schwartz to assist with opening or administering the Decedent's estate. *Compare id.* ("Dear Bey Family Members: You had asked me to help with the administration of your father's estate.") *with* Tr. 46:21–23 (Petitioner) ("Q. Did you ever ask Mr. Schwartz to help with the administration of your father's estate? A. No.").

[44] *See* Tr. at 48:14–16 (Petitioner).

15. Upon petition from the Respondent, the Purported Will was admitted to probate by the Delaware Register of Wills on September 14, 2022.[45] Letters Testamentary were issued to the Respondent on October 6, 2022.[46] The Respondent has not commenced ancillary estate administration in Pennsylvania.[47] But the Respondent is actively managing and collecting rent from the Decedent's Pennsylvania properties.[48]

16. On February 23, 2023, the Petitioner initiated this action.[49] The relevant procedural posture has been addressed above.

## CONCLUSIONS OF LAW

17. The Petitioner seeks an order invalidating the Purported Will and shifting the Petitioner's costs and fees either onto the Decedent's estate or the Respondent. The Petitioner bears the burden of proving her claims.

---

[45] Pretrial Order at p. 5 ¶ 9. Outside of the estate, the Decedent's children received insurance payouts from his life insurance. *See* Tr. at 30:8–13 (Petitioner).

[46] Pretrial Order at p. 6 ¶ 10. I have taken judicial notice of the Register of Wills docket. *In re Joseph Holder Bey*, Folio No. 26047 ("Bey ROW"). "Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice." *Arot v. Lardani*, 2018 WL 5430297, at *1, n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; D.R.E. 202(d)(1)(C)). There is minimal activity thereon; the last docket entry reflects that the Respondent was invoiced for a late fee associated with the accounting on June 5, 2024. Bey ROW D.I. 12.

[47] Pretrial Order at p. 6 ¶ 11.

[48] *Id.* ¶ 12.

[49] D.I. 1.

18.     I conclude that the Purported Will is invalid, and the Petitioner is entitled to costs. I reject, however, the Petitioner's argument that the Respondent litigated in bad faith and find that the Petitioner's fees should be borne by the Decedent's estate.

## I.     The Purported Will is invalid.

19.     "When a will is challenged as a forgery, the challenger has the burden of proving such forgery in a clear, direct, precise, and convincing manner."[50] If there is "direct and credible evidence" of authenticity, opinion evidence, alone, is insufficient to overcome it.[51] Such direct and credible evidence includes a self-proving affidavit, documentary evidence, or other direct witness testimony.[52]

20.     The Purported Will includes an affidavit, which is similar to what would be expected under Title 12, Section 1305 of the Delaware Code, the statute for self-proved wills.[53] A will that complies with such statute may be probated without the attesting witnesses appearing before the Register of Wills and carries with it a presumption "that the testator executed the will in their presence while

---

[50] *In re Hammond*, 2012 WL 3877799, at *2 (Del. Ch. Aug. 30, 2012) (citation and quotation marks omitted).

[51] *In re Melori*, 1987 WL 6442, at *6 (Del. Ch. Feb. 11, 1987).

[52] *See* 12 *Del. C.* §§ 1305, 1310.

[53] I invoke this standard, notwithstanding that the Purported Will was purportedly executed in Philadelphia, Pennsylvania, and without any better benchmark from the Parties.

appearing to be of sound mind and free from duress."[54] But that presumption can be overcome with "proof of fraud or forgery affecting the . . . affidavit[.]"[55]

21. The Petitioner has overcome the presumption. The Petitioner's expert witness was eminently qualified, persuasive, and convincing; his analysis and comparisons were adequately explained and not persuasively undercut through cross-examination. His opinion not only calls into doubt the affidavit, but leaves me with a firm conviction that the Decedent's signature thereon is not genuine. The direct evidence of the exemplary signatures supports that conclusion even to the lay eye.

22. The only other "direct" evidence that could be said to weigh against the convincing expert opinion is the deposition testimony of Mr. Strange. Mr. Strange's recollection of the Purported Will and its signing was fuzzy, confusing, and difficult to credit. It fails to call into doubt the conclusions reached by the expert after his methodical analysis, or provide any plausible explanations for the noticeable discrepancies between the Decedent's signature on the Purported Will and his other known signatures.

---

[54] *In re Carter*, 565 A.2d 933, 934, n.2 (Del. 1989).

[55] *See* 12 *Del. C.* § 1310.

23. The Petitioner proved, in a clear, direct, precise, and convincing manner, that the signature on the Purported Will is not genuine and was not affixed by the Decedent.[56]

## II. The Petitioner's fees should be borne by the Decedent's estate.

24. The Petitioner asks that her fees be shifted to the Respondent under the bad faith exception to the American Rule or, alternatively, be borne by the Decedent's estate. I find bad faith fee shifting unsupported, but that the Petitioner provided a benefit to the Decedent's estate supporting payment of her fees therefrom.

25. "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[57] There are several exceptions;

---

[56] To avoid this outcome, the Respondent points me to Vice Chancellor Glasscock's decision in *In re Hammond*, 2012 WL 3877799 (Del. Ch. Aug. 30, 2012). I find *Hammond* distinguishable. Therein, Vice Chancellor Glasscock doubted the expert testimony because "to the lay eye," the challenged signature was "consistent with the exmplars[,]" noting the expert "noted technical differences[.]" *Id.* at *2. Left with "sworn statements of the witnesses, juxtaposed against the opinion of the handwriting expert[,]" the Vice Chancellor could not find clear and convincing evidence that the signature was inauthentic. *Id.* Here, the differences in the signature are apparent to even the lay eye, direct evidence that renders the expert opinion highly persuasive and, ultimately, proves sufficient to outweigh the mere existence of the affidavit and the equivocal testimony of Mr. Strange. These obvious differences also distinguish this case from *In re Melori* wherein this Court concluded the signature differences presented to it had "equally plausible explanations." 1987 WL 6442, at *7 (Del. Ch. Feb. 11, 1987). Here, the only plausible explanation for the variances is that someone other than the Decedent affixed his signature to the Purported Will.

[57] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

"[f]or example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the action results in the creation, protection or distribution of a common fund or confers a corporate benefit."[58] The Petitioner invokes (iii) and (v), which I address in turn.

26.     This Court "does not invoke the 'bad faith exception' lightly and imposes the stringent evidentiary burden of producing 'clear evidence' of bad-faith conduct on the party seeking an award of fees."[59] Although I have found the Purported Will invalid and remain disappointed that the Respondent did not attend the long-scheduled trial, the Petitioner falls short of the clear evidence required for bad faith fee shifting. Nor is this a case where "a party engaged in conduct which, on its face, would establish a *prima facie* case for violating a criminal statute provid[ing] powerful evidence that the party acted in bad faith."[60] The trial record does not support a *prima facie* case that the Respondent was the person who signed

---

[58] *In re Del. Pub. Sch. Litig.*, 312 A.3d 703, 716 (Del. 2024).

[59] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER).

[60] *Choupak v. Rivkin*, 2015 WL 1589610, at *21 (Del. Ch. Apr. 6, 2105), *aff'd*, 129 A.2d 232 (Del. 2015).

13

the Decedent's name on the Purported Will. I am, simply, not firmly convinced that the Respondent litigated this action in bad faith.[61]

27. "The 'common fund' exception enables a litigant who succeeds in conferring a monetary benefit upon an ascertainable class of individuals to recover costs from the fund that he or she has created."[62] Here, the Petitioner has succeeded in invalidating the Purported Will, which provides a fund for the Decedent's intestate heirs that did not previously exist for their benefit. The Petitioner's fees should be taken from that fund, and borne equally by all heirs, who would otherwise benefit from the Petitioner's efforts, without comparable contribution.[63]

### III. Costs should be shifted in the Petitioner's favor.

28. Under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." "Under Rule 54(d), the 'prevailing' party is a party who successfully prevails on the merits of the main issue or the party who prevailed on most of their claims."[64] That party is the

---

[61] *Cf. B.E. Cap. Mgmt. Fund LP v. Fund.com Inc.*, 2024 WL 3451459, at *18 (Del. Ch. July 18, 2024) (finding clear evidence that the party against whom fees were shifted falsified records); *Choupak*, 2015 WL 1589610, at *22 (same).

[62] *Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1090 (Del. 2006).

[63] *See also In re Goldberg*, 1978 WL 22003, at *6 (Del. Ch. Feb. 9, 1978) (referencing Delaware common law permitting caveators to be paid from the applicable estate in "a proper case"); 12 *Del. C.* § 1308(b) ("The Court of Chancery may determine the costs occasioned by such caveat and decree the payment thereof.").

[64] *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *48 (Del. Ch. Mar. 15, 2023).

14

Petitioner. And because the Respondent has not demonstrated that shifting costs would be inequitable, I find costs should be shifted in the Petitioner's favor.[65]

\* \* \*

29. For the foregoing reasons, the Purported Will should be declared invalid, and the Register's orders admitting it to probate and issuing Letters Testamentary to the Respondent should be revoked. The Decedent's estate should pass intestate, probated by the representative of the Register of Will's choosing, upon petition(s). The Petitioner's fees should be borne by the Decedent's estate and her costs should be shifted to the Respondent.

30. This is a final report under Court of Chancery Rules 143 and 144. Exceptions may be taken within eleven days of the date hereof.[66]

/s/ Selena E. Molina
Magistrate in Chancery

---

[65] *In re Oracle Corp. Deriv. Litig.*, 2023 WL 9053148, at \*3 (Del. Ch. Dec. 28, 2023) (explaining that "typically, the burden lies with the non-prevailing party to rebut the presumption under Court of Chancery Rule 54(d) that the prevailing party should receive costs, of course").

[66] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").